**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHERYL J. SHARP,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant*.

_____/

CASE NO. 18-11317

DISTRICT JUDGE MARIANNE O. BATTANI
MAGISTRATE JUDGE PATRICIA T. MORRIS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 12, 15)

## I.    RECOMMENDATION

Plaintiff Cheryl Sharp appeals from defendant Commissioner's final decision denying her application for disability benefits. In light of the record, I suggest that substantial evidence does not support the Commissioner's decision. Accordingly I recommend **GRANTING** Plaintiff's Motion for Summary Judgment, (Doc. 12), **DENYING** the Commissioner's Motion, (Doc. 15), **VACATING** the Commissioner's final decision denying benefits, and **REMANDING** the case to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Introduction and Procedural History[1]

_____

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, (R. 4), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Disability Insurance Benefits.

Plaintiff applied for Title II Disability Insurance Benefits (DIB) on August 21, 2015, alleging that her disability had begun a month prior, in July 2015. (R. 7, PageID.133, 225.) The Commissioner denied the claim. (R. 7, PageID.149.)  Plaintiff then requested a hearing before an administrative law judge (ALJ), which occurred on January 26, 2017. (R. 7, PageID.71-105.)  The ALJ issued a decision on May 10, 2017, finding Plaintiff not disabled during the relevant period. (R. 7, PageID.41-56.) On February 27, 2018, the Appeals Council denied review, (R. 7, PageID.31-34), and Plaintiff filed the present action on March 7, 2018. (R. 1). She then moved for summary judgment on August 29, 2018, (R. 12), and Defendant countered with her own motion, (R. 15). Plaintiff has replied, (R. 16), and the case is now ready for resolution.

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

2

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets or
> equals one of our listings in appendix 1 of this subpart and
> meets the duration requirement, we will find that you are

3

disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 7, PageID.55.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the day the disability began, July 29, 2015. (R. 7, PageID.44.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and thoracic spine; fibromyalgia; migraine headaches; status-post pituitary removal; obesity; neuropathy; generalized anxiety disorder; and persistent depressive disorder. (*Id.*) None of these impairments, alone or in combination with others, met or equaled a medical listing at step three. (R. 7, PageID.45-47.)

Before completing the final steps, the ALJ found that Plaintiff had the RFC to perform

> sedentary work as defined in 20 CFR 404.1567(a) except: She can occasionally balance, kneel, stoop, crouch, crawl, climb ramps, and climb stairs; She can never climb ladders, ropes, and scaffolds. She can never be exposed to workplace hazards such as unprotected heights and dangerous, moving machinery; She cannot drive commercially. She is limited to understanding, remembering, and carrying out simple, routine, and repetitive tasks. She has limited depth perception such that she is unable to make accurate judgments of distance and speed. She can frequently use foot controls bilaterally; she must use an assistive device to ambulate.

(R. 7, PageID.47.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (R. 7, PageID.54.) At step five, the ALJ determined that the national economy had jobs in significant numbers that Plaintiff could perform. (*Id.*) [2]

---

[2] Plaintiff had filed an earlier application for benefits that was rejected by a different ALJ in July 2015. (R. 7, PageID.110.) The prior decision listed the same severe impairments but excluded neuropathy and obesity;

### E.   Administrative Record

### 1.   Overview of the Medical Evidence

The record stretches to 1029 pages, containing much evidence on impairments that are not at issue in the parties' Motions. While I have reviewed the entire record, this overview focuses on the disputed conditions and will be supplemented as needed in the analysis below.

After gastric bypass surgery in 2009, Plaintiff's weight gain persisted. (R. 7, PageID.359.) She suspected Cushing's syndrome, (*id.*), which can occur in different ways including when a benign (*i.e.*, noncancerous) tumor on the pituitary gland causes the body to overproduce cortisol, *see* Mayo Clinic, *Cushing syndrome*, https://www.mayoclinic.org/diseases-conditions/cushing-syndrome/symptoms-causes/syc-20351310 (last accessed April 16, 2019). She was correct: an MRI demonstrated a tumor on her pituitary gland, and she was diagnosed with Cushing's. (R. 7, PageID.342, 357, 359.) In July 2010, Dr. Jack Rock surgically removed the tumor. (R. 7, PageID.325-328.)

Afterwards, Plaintiff suffered from severe headaches and fatigue, and she

---

the RFC was slightly different but not in any meaningful manner. (R. 7, PageID.112.) The parties do not argue about the binding effect of the prior decision on the present ALJ. When the instant decision was issued, the rule in this Circuit was that a prior decision was binding even as to later periods unless circumstances had changed. *Johnson v. Comm'r of Soc. Sec.*, No. 2:17-cv-13126, 2018 WL 6440897, at *15 (E.D. Mich. Oct. 22, 2018), *Rep. & Rec. adopted by* 2018 WL 6434778 (E.D. Mich. Dec. 7, 2018). That rule was clarified in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), which held that a prior ALJ decision does not prevent the Commissioner from taking a "fresh look" at the evidence covering a new period of disability. "Courts applying *Earley* to ALJ decisions issued before that case have asked whether the ALJ, despite purporting to follow [the old rule], gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate." *Johnson*, 2018 WL 6440897, at *15. Here, as noted, neither side claims that the ALJ erred by purporting to follow the old rule and, in any case, the ALJ appears to have given the evidence a "fresh look" by canvassing the relevant records and not hesitating to alter the prior ALJ's findings.  (R. 7, PageID.41.)

questioned whether she could return to work as a special education teacher's aide. (R. 7, PageID.357.) She eventually resumed working and began caring for her aunt, but had no energy to exercise, even though her doctor continued to encourage it. (R. 7, PageID.351-355.) The doctor thought that the fatigue stemmed from the lower doses of steroids she was now receiving and that she needed to begin an exercise program. (R. 7, PageID.358.)

The fatigue remained in the months following the procedure. (R. 7, PageID.351, 353, 355.) By April 2011, she was also experiencing insomnia and memory lapses and still could not exercise. (R. 7, PageID.351.) By July, the fatigue had grown severe, accompanied by dizziness and headaches, yet she had started exercising with walks in the morning and weight training at night. (R. 7, PageID.349.) Her doctor was at a loss for what could be causing the symptoms. (R. 7, PageID.350.) The following year, 2012, she continued to complain of fatigue and also of depression and stress. (R. 7, PageID.344, 347.)

When her cortisol crept up again in 2016 the physician speculated it was "remnant activity of" Cushing's syndrome. (R. 7, PageID.725, 736.) Eventually the cortisol level came under control. (R. 7, PageID.717, 720, 724; *see also* R. 7, PageID.904, 909, 938 (2016 reports noting no recurrence).) And her lingering fatigue and restlessness might have been related to sleep apnea obstruction, which she was diagnosed with in 2016. (R. 7, PageID.834; *but see* R. 7, PageID.1024 (Plaintiff reported that a sleep study did not find obstructive sleep apnea).)

In June 2014, she was treated for headaches, vertigo, and head tremors. (R. 7, PageID.556.) She denied "significant daytime sleepiness, or feeling tired upon awakening in the morning." (*Id.*) Her gait was normal, as were her reflexes. (*Id.*; *see also* R. 7,

7

PageID.557) The dizziness was ongoing a few months later (confirmed by a positive Romberg Test), despite treatment with prescription medication. (R. 7, PageID.557.)

From 2014 through 2016, Dr. Nawaf Murshed treated Plaintiff's dizziness and vertigo. (R. 7, PageID.609-621, 866, 868, 873.) She mentioned, too, having daily headaches (which improved slightly in November 2015 but then regressed) and numbness and weakness in her arms and legs. (R. 7, PageID.609, 615, 617, 620, 875, 878.) The migraines abated a bit with Botox, (R. 7, PageID.860, 863, 866, 868), but she also said the injections did not help, (R. 7, PageID.912). The cause of the dizziness and limb problems was not apparent to Dr. Murshed, but he followed this observation in June 2015 by noting that a tumor was discovered on a vertebra, (R. 7, PageID.883), and repeating this sequence of statements in later reports, never saying there was a connection between the dizziness and spinal tumor. (R. 7, PageID.867, 868, 870, 873, 875, 879, 881.) Under the same section, addressing Plaintiff's ataxia (*i.e.*, her dizziness and numb limbs) the notes from February 2016 mentioned that Plaintiff "will need wheeled walker," (R. 7, PageID.875), and subsequent reports merely said "wheeled walker," (R. 7, PageID.861, 863, 868, 870, 873; *see also* R. 7, PageID.895.)

The notes from physical examinations with Dr. Murshed contained many normal findings—for example, she had normal strength, reflexes, and gait—but also some abnormalities including diminished sensation in her arms, irregular reflexes, and trouble tandem walking. (R. 7, PageID.609, 612, 615, 618, 621; *see also* R. 7, PageID.860, 863, 866, 868, 870, 873, 875, 878 ("intact gait").) She was diagnosed with ataxia, a condition marked by abnormal movements, even though at more than one appointment the physical

8

examination results stated, "no ataxia." Johns Hopkins Medicine, *What is Ataxia?*, https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/index.html (last accessed April 16, 2019). (R. 7, PageID.612, 615, 617.)

Imaging studies from 2014 did not uncover any pathologies that could explain the symptoms, according to Dr. Murshed, although they did reveal "minimal left" carpal tunnel syndrome. (R. 7, PageID.616-617.) Again in October 2016, cranial imaging studies failed to flag any abnormalities. (R. 7, PageID.861.) Regarding her back, in October 2016 Dr. Murshed discussed a recent imaging study showing polyradiculopathy in Plaintiff's lumbar spine, leading to a lumbago diagnosis with the additional note that her back pain was worsening. (R. 7, PageID.863-864.) At the following visit, Dr. Murshed said the pain was fluctuating (though Plaintiff claimed it was increasing), and an MRI displayed only a small disc protrusion and no narrowing. (R. 7, PageID.861.)

At a May 2016 appointment with Dr. Nadia Khoury, Plaintiff described her migraines as "worse than ever" and her dizziness as "horrible." (R. 7, PageID.730.) She used a walker or cart 90 percent of the time, she reported. (*Id.*) Dr. Khoury did not know the cause of the dizziness, but she doubted that it or the migraines were related to the endocrine system, (R. 7, PageID.725, 728), of which the pituitary gland (the one that Plaintiff had the tumor removed from) is the "master gland," Ian Chapman, *Overview of the Pituitary Gland*, in Merck Manual (November 2017), https://www.merckmanuals.com/home/hormonal-and-metabolic-disorders/pituitary-gland-disorders/overview-of-the-pituitary-gland.

Dr. Sleman Albert Khoury—who also treated Plaintiff, apparently out of the same

office as the other Dr. Khoury—mentioned in August 2016 that extensive testing by another physician had failed to reveal the etiology. (R. 7, PageID.935.) He now suspected that sleep apnea at least partially explained the fatigue. (R. 7, PageID.935, 938, 941, 942.) After a sleep study, she was diagnosed with obstructive sleep apnea and fitted with a CPAP, which she ended up being unable to "tolerate." (R. 7, PageID.939, 1030, 1033, 1042.)

At other sessions with the Drs. Khoury the examination results were normal; specifically, the neurological findings flagged no abnormalities, although it does not appear her strength or musculoskeletal systems were tested. (R. 7, PageID.911, 915, 919, 930, 937, 940; *see also* R. 7, PageID.924-925, 934 (similar test results from Dr. Haejin Kim).) The reports from the sleep apnea specialists also contained largely normal examination results, particularly normal gait and coordination. (R. 7, PageID.1032, 1037.)

Her primary care physician was Dr. J. Ricardo Compean. (R. 7, PageID.49.) A 2013 physical examination of Plaintiff revealed normal strength and reflexes. (R. 7, PageID.466.) In 2015 and 2016, she complained variously of fatigue (which was stable and moderately limited her activities), knee pain, burning in her legs and arms (which did not limit her activities), hip pain (which "moderately limits activities"), chest pain, and daily headaches, dizziness, neck pain, and hip pain (which moderately limited her activities). (R. 7, PageID.568-569, 573, 578, 762-763, 773-774, 784-785, 795, 803, 810-811, 821-822.) The relevant results of her physical examinations were largely unremarkable: aside from a positive Romberg test, knee crepitus at an examination in 2016, and tender pelvis, she displayed no abnormalities and had steady gait, full movement of the head and neck, and normal strength and coordination. (R. 7, PageID.572, 579, 766, 777, 788, 804, 814, 825.)

Regarding the dizziness, Dr. Compean suspected it was related to Plaintiff's hypoglycemia, which he in turn believed was associated with her pituitary issues or perhaps her past gastric bypass procedure. (R. 7, PageID.568, 789.)

Plaintiff also saw a gastroenterologist, Dr. Lesa Chopra. (R. 7, PageID.595.) The examination results from their appointments in 2015 and 2016 revealed no evidence of motor weakness. (R. 7, PageID.591, 593, 596, 679, 682, 685, 688, 691, 839.)[3] Plaintiff was diagnosed with various gastro-related issues, including diarrhea and irritable bowel syndrome. (R. 7, PageID.591.) In addition, she had dysphagia (i.e., trouble swallowing). (R. 7, PageID.702.)

An MRI of Plaintiff's thoracic spine from April 2015 showed disc osteophytes (i.e., bone spurs), Mayo Clinic, *Bone Spurs*, https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last accessed April 16, 2019), as well as abnormal signals at one vertebra, which later turned out to be caused by a lesion. (R. 7, PageID.586, 589, 751.) A few months later, another thoracic MRI showed protrusions and disc desiccations as well. (R. 7, PageID.750.) An MRI of the cervical spine showed no significant disc protrusion, stenosis, or neural foraminal narrowing, and only mild disc desiccation. (R. 7, PageID.587-588.) Around the same time, a bone scan showed arthritic and degenerative changes in the knees, shoulders, and sacroiliac joint (where the pelvis and lower spine meet, Mayo Clinic, *Sacroiliitis*, https://www.mayoclinic.org/

---

[3] Strangely, the "Review of Systems" portion of a few session notes showed Plaintiff denying all impairments, including back pain, headache, and dizziness—it is highly doubtful that this portion of the report is accurate as it contradicts other portions and other reports. (R. 7, PageID.682, 685, 688, 839.)

diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747 (last accessed April 16, 2019)). (R. 7, PageID.587.) A right knee MRI taken in February 2016 showed degenerative changes and joint effusion. (R. 7, PageID.852.)

After falling in July 2015, Plaintiff began to experience ankle trouble. (R. 7, PageID.671.) She mentioned the issue to Dr. Compean, describing it as a "mild to moderate" complaint and noting that she had been falling since spraining her ankle. (R. 7, PageID.762, 773, 810-811, 821.) In a September 2015 report, Dr. Compean observed that Plaintiff did not have an assistive device. (R. 7, PageID.822.) At multiple examinations in 2016, her ankle had normal strength, stability, and range of motion, but was tender. (R. 7, PageID.777, 788, 814.) The pain persisted, and she sought additional treatment in February 2016. (*Id.*) A 2016 study showed, among other things, joint effusion, marrow edema, heel spurs, and mild plantar fasciitis. (R. 7, PageID.677.) Months later, she was still in pain and another physician found that the arches of her feet had prolapsed, or fallen. (R. 7, PageID.662.)

On top of these physical issues, Plaintiff had suffered from fibromyalgia since about 1990. (R. 7, PageID.903.) At a session in 2014, she described the symptoms as moderate to severe, and said that they worsened when she moved or stood and that they caused fatigue and impeded daily activities such as dressing and housework. (*Id.*) During the same appointment, her physical examination results were normal, with "[g]rossly normal" neurological findings and full range of motion in her spine, shoulders, wrists, hips, knees, ankles, fingers, and elbows. (*Id.*)

In counseling records from 2015 and 2016, Plaintiff was diagnosed with depression

and prescribed psychotropic medication, although she reported having "historically responded poorly to antidepressants." (R. 7, PageID.560, 637, 1003, 1017, 1018, 1022; *see also* R. 7, PageID.1011, 1013 (noting Plaintiff's past poor responses to antidepressants).) Plaintiff reported sleep disruptions, fatigue, migraines, and difficulty walking and numbness in her arms and feet, although the examination notes indicate her gait and station were stable. (R. 7, PageID.559, 562, 634, 1012.) The notes state that the dizziness was of unknown origin. (R. 7, PageID.563, 1013.) At times, her mood improved, (R. 7, PageID.1017, 1018, 1020), but at others it deteriorated, (R. 7, PageID.1024, 1025).

In 2016, one of the psychiatrists who had been treating Plaintiff filled out a medical opinion form. (R. 7, PageID.642-644.) In it, she indicated that Plaintiff had problems with fatigue, concentration, and sleep, among other things. (R. 7, PageID.642.) Daily life did not pose much of a problem, but social functioning did. (R. 7, PageID.643.) Plaintiff had slight to moderate limitations in most areas, but moderately severe to severe in others, including completing a normal workday without interruption from her psychological symptoms, interacting with coworkers without distraction, and accepting instructions and criticism. (R. 7, PageID.644.) Even at a sedentary, low-stress job, Plaintiff would miss six or more days of work each month due to her mental and physical conditions. (*Id.*)

Dr. John Kwock also filled out a similar form (or more precisely, parts of it, leaving the rest unanswered, including sections for explanations). (R. 7, PageID.710-716.) The form indicates that Plaintiff could, without interruption, sit, stand, or walk for four hours, and remain in each of these postures for up to six hours in an eight-hour workday. (R. 7, PageID.710.) She did not need a cane. (*Id.*) Activities with her arms and hands, such as

reaching and handling, were unimpaired, and her feet could operate foot controls frequently (for one-third to two-thirds of the workday). (R. 7, PageID.711.) Her daily activities were unimpeded. (R. 7, PageID.714.)

Dr. Murshed, too, opined on Plaintiff's functional capabilities. (R. 7, PageID.1054.) In a form completed on January 20, 2017, Dr. Murshed stated that Plaintiff could work for six hours in a day and sit for only 15 minutes at a time and two hours out of the day, but could not walk at work. (*Id.*) She could occasionally use her hands and arms and occasionally lift up to five pounds. (*Id.*) Overall, her pain was moderate, and the medications she took for it "may cause fatigue." (*Id.*) In a typical month, her conditions would cause her to miss four or five days of work. (*Id.*)

### 2.   Application Reports and Administrative Hearing

### i.   Plaintiff's Report

Plaintiff completed her Adult Function Report in September 2015. (R. 7, PageID.279.) Her main impairments were, among others, dizziness and falling, trouble walking, neck and back pain, depression, anxiety, and numbness in her hands and feet. (R. 7, PageID.272.) These conditions affected a host of functions, including her memory, lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, seeing, completing tasks, concentrating, following instructions, using her hands, getting along with others, and understanding. (R. 7, PageID.277.) She managed only a few hours of fitful sleep each night. (R. 7, PageID.273.) With her family's help, she fed her children, assisted with homework, cleaned the house, and took care of pets. (R. 7, PageID.273-274.) She needed assistance bathing herself. (R. 7, PageID.273.) She could drive a car and ride in

one, and she shopped once or twice a week for groceries. (R. 7, PageID.275.)

### ii.    Plaintiff's Testimony at the Administrative Hearing

The hearing was held on January 26, 2017. (R. 7, PageID.71.) At the start of the hearing, Plaintiff's representative discussed her worsening condition and the prescription in 2016 of a wheeled walker. (R. 7, PageID.76.) Plaintiff then testified. She explained that she did not drive regularly, due to vertigo, and that she was fired from her last job, in 2013, for taking too many sick days, again because of vertigo but also because of migraines and her back and leg pain. (R. 7, PageID.79-81.) Her neuropathy made her limbs feel like they had been set aflame. (R. 7, PageID.89.)

The testimony then turned to Plaintiff's tumor removal, with the ALJ asking if any the surgery left any residual effects. (R. 7, PageID.82.) Plaintiff responded that she had been again diagnosed with Cushing's syndrome in April or May 2016 and was receiving medication for the high cortisol levels. (R. 7, PageID.82, 95.) It was "hard to say" just how the cortisol levels affected her, although she said the fatigue and headaches were "associated" with Cushing's. (R. 7, PageID.83, 94.) Later, however, she offered more details, stating that her doctors think her vision loss and vertigo could be traced to the tumor and the surgery she had to remove it. (R. 7, PageID.90.)

She had not sought treatment for her degenerative disc disease since the prior ALJ decision. (*Id.*) But she had undergone recent imaging studies showing a tumor on her spine. (R. 7, PageID.84-85.) The back pain persisted and the medications she took provided little relief. (R. 7, PageID.83-84.) Botox helped with her head tremors and Excedrin sometimes dulled the headaches, but they still occurred every day for hours if not the entire day. (R.

15

7, PageID.85.) No one had been able to resolve her dizziness and vertigo. (R. 7, PageID.86.)

In addition to these conditions, her back pain would shoot down her legs, which would then have to be elevated for over half the day. (R. 7, PageID.91.) The fatigue and pain also led her to take a few naps every day for about 30 minutes each time. (R. 7, PageID.92.) She used a walker even inside her house to prevent falls. (R. 7, PageID.93.) With the walker and on a good day, she could walk two blocks. (*Id.*) Standing and sitting were likewise a struggle. (R. 7, PageID.93-94.)

### iii.        The Vocation Expert's Testimony

The ALJ asked the vocational expert to imagine an individual who could perform

> a full range of sedentary work, except she can occasionally balance, kneel, . . . stoop, crouch, and crawl . . . . She can occasionally climb ramps and stairs. She can never climb ladders, ropes, and scaffolds.
>
> She can never be exposed to workplace hazards such as unprotected heights and dangerous moving machinery. She cannot drive commercially. She is limited to understanding, remembering, and carrying out simple, routine, and repetitive tasks. She has limited depth perception such that she is unable to make accurate judgements about distance and speed.

(R. 7, PageID.101.) Such an individual, the expert testified, could not perform Plaintiff's past jobs but could work as a toy packer (35,000 positions nationally), sedentary unskilled inspector (14,000 positions), and sedentary unskilled assembler (43,000 positions). (R. 7, PageID.101-102.) If, in addition to the above restrictions, the individual could frequently use foot controls and needed an "assistive device to ambulate," the same jobs remained available. (R. 7, PageID.102.) "[T]hese jobs would allow for an assistive device to ambulate," the expert stated. (*Id.*) Employers typically permitted only three breaks a day

16

and one unexcused absence a month, and a worker could not sustain employment if her off-task time was 15 percent or more or if she needed to elevate her leg during work hours. (R. 7, PageID.103.)

###    F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[4] carve the evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9,

---

[4] Various amendments have been made to the regulations since Plaintiff filed her claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed her claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial

evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July

2, 1996).[5] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he

---

[5] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c).

or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

## G.    Arguments and Analysis

Plaintiff argues that the ALJ erred by failing to (1) consider Listing 11.05 at step three; (2) specify the type of assistive device Plaintiff needed; and (3) adequately account for her fatigue. The first two arguments have merit, and I accordingly recommend remand. The third does not.

### 1.    Listing 11.05

#### a.    Issue Exhaustion

Plaintiff argues that the ALJ erred at step three by not even considering whether she met or equaled Listing 11.05 for benign tumors. (R. 12, PageID.1087.) But whether the

21

Court can wade into the merits depends on Defendant's threshold contention that Plaintiff never properly exhausted this issue below, *i.e.*, she failed to flag it for the ALJ's consideration. (R. 15, PageID.1114.) Defendant distinguishes Plaintiff's failure to exhaust at the ALJ level from caselaw holding that a claimant does not need to exhaust an issue by raising it before the Appeals Council. (R. 15, PageID.1115.) Generally, Defendant adds, a claimant must bring the issue to the agency's attention or else courts will deem it unexhausted and waived. (R. 15, PageID.1115-1116.)

As Defendant acknowledges, however, Plaintiff's brief to the Appeals Council raised the issue of her meeting or equaling Listing 11.05. (R. 15, PageID.1114, citing R. 6, PageID.318-317.) That Plaintiff actually raised the matter at the agency level does not deter Defendant, who seems to assume that an issue is exhausted only if it is raised to the ALJ. But that assumption is not self-evidently true. Thus, the question here is whether Plaintiff exhausted the issued by raising it to the Council after failing to raise it to the ALJ.

The analysis starts with *Sims v. Apfel*, 530 U.S. 103 (2000). The claimant there failed to make an argument to the Appeals Council that she subsequently raised in the district court. *Id.* at 105-06. The Court examined three potential sources for an issue exhaustion requirement that would bar her from bringing the unexhausted claim to court. Nothing in the first two sources—statutes and agency regulations—mandated issue exhaustion in Social Security cases. *Id.* at 107-108. The last category consisted of judicially created exhaustion rules. *Id.* at 108-112. To fall within this final category, the relevant administrative proceeding must resemble adversarial litigation, particularly in the expectation that "the parties . . . [will] develop the issues." *Id.* at 110.

22

A majority of the Court signed on to these assertions. Only a plurality supported the operative holding that issue exhaustion did not apply because Appeal Council review was inquisitorial rather than adversarial. *Id.* at 110-112. Justice O'Connor's concurrence did not address the nature of the agency proceedings, instead resting on "the agency's failure to notify claimants of an issue exhaustion requirement in this context." *Id.* at 113 (O'Connor, J., concurring). For their part, the four dissenters agreed that the proceedings at the Appeal Council and ALJ levels were not adversarial but thought that this made no difference—the reasons for a general rule requiring exhaustion applied just as much, if not more, to agencies as they did to courts because agencies had expertise in the disputed subject matter. *Id.* at 115-117 (Breyer, J., dissenting).

The Court in *Sims* was not faced with, and expressly declined to decide, whether claimants had to exhaust issues at the ALJ level. *Id.* at 107. But the plurality's expansive language considered the entire application process inquisitorial: "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . and the Council's review is similarly broad." *Id.* at 110-11 (citations omitted). The Commissioner's regulations confirm that the process is meant to be non-adversarial. 20 C.F.R. § 404.900(b) ("Nature of the administrative review process. In making a determination or decision in your case, we conduct the administrative review process in an informal, non-adversarial manner."). If, as a majority of the Court held, issue exhaustion applies to adversarial rather than inquisitorial administrative proceedings, and the ALJ's review is inquisitorial, it

would follow that issue exhaustion does not apply at the ALJ level.[6]

The dissent thought otherwise. It noted that the "petitioner asked the reviewing court to consider arguments that clearly fall within the general rule, namely, whether an administrative law judge should have ordered a further medical examination or asked different questions of a vocational expert." *Id.* at 115 (Breyer, J., dissenting). The dissent further predicted that the "plurality would not forgive the requirement that a party ordinarily must raise all relevant issues before the ALJ." *Id.* at 117.

Many lower courts have held that claimants waive any issues not raised before the ALJ. *See Howard v. Comm'r of Soc. Sec.*, 330 F. App'x 128, 130 (9th Cir. 2009); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003); *Brady v. Barnhart*, 36 F. App'x 914 (9th Cir. 2002); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999); *Watson v. Astrue*, No. 08 Civ. 1523, 2010 WL 1645060, at *3-4 (S.D. N.Y. Apr. 22, 2010). Some courts in this Circuit have required claimants to exhaust all issues at the hearing level. *See, e.g.*, *Motin v. Comm'r of Soc. Sec.*, No. 09-CV-13354, 2010 WL 1754871, at *8-9 (E.D. Mich. Apr.

---

[6] By the crude measure of counting heads, at least five Justices can be found supporting two key propositions: (1) issue exhaustion applies to agency proceedings that resemble adversarial litigation (five Justices voted for this holding, expressed in section II(A) of Justice Thomas's opinion), and (2) ALJ proceedings are inquisitorial (the plurality and the dissent agreed upon this). *Id.* at 110-112 (Thomas, J., plurality); *id.* at 117 (Breyer, J., dissenting) ("An initial ALJ proceeding is, after all, itself nonadversarial."). The second proposition, unlike the first, does not come with the imprimatur of being in a majority opinion. The Justices were not alone in concluding that the ALJ's role is inquisitorial. *See* Jeffrey S. Wolfe & Lisa B. Proszek, *Interaction Dynamics in Federal Administrative Decision Making: The Role of the Inquisitorial Judge and the Adversarial Lawyer*, 33 Tulsa L. J. 293, 296-299 (1997) (describing the ALJ as an "inquisitorial judge"); Jon C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*, 97 Colum. L. Rev. 1289, 1303 (1997) ("The ALJ performs an active investigatory role, particularly in disability cases, and shoulders a statutory obligation to obtain evidence from the claimant's doctors and other treatment sources. . . . The proceedings [before the ALJ] are not adversarial and there is no counsel for the government."). Indeed, in an earlier case, the Court had endorsed the ALJ's role "as an examiner charged with developing the facts." *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

6, 2010), *adopted by* 2010 WL 1754821 (E.D. Mich. Apr. 30, 2010).[7]

But, as noted, the question here is whether a claimant can exhaust an issue by raising it to the Appeals Council even if it was not brought to the ALJ's attention. The Sixth Circuit has suggested it is exhausted in these circumstances. The court tackled the issue most directly in *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804 (6th Cir. 2012). There, the court articulated the general principle that an argument must have "been raised in the agency proceeding that preceded the appeal." *Id.* at 810 (quoting *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 443-444 (6th Cir. 2005)). The reason for waiver in *Maloney* was that the claimant "did not raise the issue to the Appeals Council." *Id.* The court found "immaterial" the plaintiff's argument that she could not raise the issue to the ALJ because, "[the claimant] had to raise the issue to the agency, and had that opportunity during her administrative appeal to the Appeals Council. Her failure to do so constitutes a waiver." *Id.* Of course, the claimant in *Maloney* did not raise the issue at any administrative

---

[7] One of the rationales for these holdings is that issue exhaustion is the default rule—it generally applies absent an exception—and *Sims* simply carves out an exception, one that should not be extended. *See, e.g.*, *Fortin v. Comm'r of Soc. Sec.*, __F. Supp. 3d__, 2019 WL 1417161, at *5-6 (E.D. Mich. Mar. 29, 2019); *Hutchins v. Berryhill*, No. 18-10182, 2019 WL 1353955, at *3 (E.D. Mich. Mar. 26, 2019). That is one way of reading *Sims*. It is also possible that the Justice Thomas's opinion meant to lay the groundwork for limiting judicially created exhaustion requirements. It did, after all, begin by noting that "requirements of administrative issue exhaustion are largely creatures of statute," and also that "it is common for an agency's regulations to require issue exhaustion in administrative appeals." *Id.* 107-108. Only then does the opinion admit that the Court has "imposed an issue-exhaustion requirement even in the absence of a statute or regulation," but only when the underlying agency proceedings are analogous to adversarial litigation in court. *Id.* at 108. From this angle, the opinion seems to suggest that there is no freestanding, default issue-exhaustion requirement absent a statute or regulation creating one. Rather, courts are free to impose such a requirement only in the limited circumstance that the agency proceedings are adversarial. *See Coalition for Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 463 (6th Cir. 2004); *see also* 4 Koch, Admin. L. & Prac. § 12:22 (3d ed.) ("In *Sims v. Apfel*, the Supreme Court offered important guidance on the proper scope of judicially-imposed issue exhaustion requirements."). But this issue—whether the default rule in absence of a positive enactment is to require exhaustion or not—is unnecessary to resolve the present case and might simply be a matter of emphasis.

level, so it was not strictly necessary to decide whether the issue could have been exhausted by raising it to the Appeals Council. Yet the court said as much, telling the plaintiff that she could have preserved the issue by raising it to the Appeals Council. *See also Wells v. Apfel*, 234 F.3d 1271, 2000 WL 1562845, at *6 (6th Cir. 2000) (unpublished) (plaintiff failed to exhaust administrative remedies and "[s]imilarly, Plaintiff did not raise this issue before the Appeals Council," therefore the issue was waived).

The same principle was espoused in *Fury v. Commissioner*, No. 5:11CV1660, 2012 WL 4475661, at *1 (N.D. Ohio Sept. 26, 2012). There, the plaintiff did not articulate a Listings argument to the ALJ, but the court nonetheless found it preserved (*i.e.*, exhausted) because "the Plaintiff *did* raise the application of the listing in his notice of appeal to the review board," and the Commissioner did not "point[] to anything in the regulations that would have required Plaintiff to raise this at the initial phase of his application." *Id.*; *see also Kennedy v. Comm'r of Soc. Sec.*, No. 16-12444, 2017 WL 4324829, at *7 (E.D. Mich. Aug. 27, 2017) (noting that even if issue exhaustion is required in Social Security cases the plaintiff adequately exhausted the Listing issue by raising it to the Appeals Council), *Rep. & Rec. adopted by* 2017 WL 4310180 (E.D. Mich. Sept. 28, 2017).[8]

The Sixth Circuit's decision in *Reynolds v. Commissioner of Social Security*, 424 F.

---

[8] The Ninth Circuit also has held that raising an issue to the Appeals Council sufficed to exhaust it despite the failure of claimant's counsel to bring it up at the ALJ hearing. *Lamear v. Berryhill*, 865 F.3d 1201, 1206 (9th Cir. 2017). In part, the court relied on the ALJ's "express duty" to inquire about the issue—which involved conflicts between the Dictionary of Occupational Titles and the expert's testimony—at the hearing. *Id.*; *see also Susan M. v. Berryhill*, No. 6:17-cv-1083, 2018 WL 4692468, at *4 (D. Or. Aug. 24, 2018) (citing *Lamear* and determining that the plaintiff preserved the issue by inquiring generally at the hearing and raising the issue to the Appeals Council), *Rep. & Rec. adopted by* 2018 WL 4690361 (D. Or. Sept. 28, 2018).

App'x 411, 416 (6th Cir. 2011), is also instructive. In that case, the court found waiver (*i.e.*, nonexhaustion of the issue) when the applicant failed to "put her obesity at issue in the proceedings below: she did not list obesity as one of her impairments, or list it as one of her difficulties on any paperwork put before the *various levels of review*." *Id.* Other decisions in the circuit finding waiver similarly stress that the claimant never raised the issue at any time below. *See, e.g.*, *Hutchins v. Berryhill*, No. 18-10182, 2019 WL 1353955, at *3 (E.D. Mich. Mar. 26, 2019) (distinguishing *Sims* because Hutchins failed to raise the "issue at *any* point during his administrative proceedings, not simply on administrative appeal"). These decisions at least leave open the possibility, if not imply, that the issue would have been exhausted had the claimant raised it before the Appeals Council. *See Hutchins*, 2019 WL 1353955, at *3 (noting the "result of this case would likely be different had Plaintiff raised his Appointments Clause argument at some point during his administrative proceedings").

What is more, *Reynolds* reached the listings issue even though the plaintiff had failed to raise it before the court. 424 F. App'x at 416. The court noted that it had considered Listings arguments *sua sponte* before and that the ALJ's failure to address the Listing was not harmless because the step three analysis was potentially dispositive "regardless of what the ALJ's conclusion would have been at Steps Four and Five." *Id.*[9] *See also Kokal v.*

---

[9] Compare *Reynolds* with *Price v. Secretary of Health & Human Services*, 61 F.3d 905, 1995 WL 413428, at *2 (6th Cir. 1995) (unpublished), a pre-*Sims* opinion that simply stated, "Price did not refer to this listing before the ALJ, and consequently there is nothing for this court to review." The opinion does not explicate the theory of issue exhaustion—if that was the underlying principle—that led to this conclusion, nor does it address whether the claimant raised the issue with the Appeals Council. *See also Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015). Likewise with *Walker v. Barnhart*, 72 F. App'x 355, 356-357 (6th Cir. 2003), which rejected the plaintiff's Listing argument because he had not raised it before the

*Massanari*, 163 F. Supp. 2d 1122, 1128 n. 4 (N.D. Cal. 2001) (reaching plaintiff's listing argument despite her failure to raise it before the ALJ (where she was unrepresented), noting the ALJ's "special duty to fully and fairly develop the record and to assure that a claimant[]'[s] interests are considered"); *cf. L.B.M. ex rel. Motley v. Astrue*, No. 1:08–cv– 1354, 2010 WL 1190326, at *14 (S.D. Ind. Mar. 23, 2010) (noting caselaw suggesting that ALJ issue exhaustion "requires an analysis of the particular errors alleged in a case," such as in affirmative duties placed on ALJs that "depart from the adversary model"). *Reynold*'s approach is not an aberration; as a court in this District has observed, "'Notably, in Social Security cases, the failure to submit a particular legal argument is "not a prerequisite to the Court's reaching a decision on the merits' or a finding, *sua sponte*, that grounds [exist] for reversal."'" *Thick v. Comm'r of Soc. Sec.*, No. 2:18-CV-10154, 2018 WL 6683348, at *16 (E.D. Mich. Nov. 29, 2018) (citing *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013)), *Rep & Rec. adopted by* 2018 WL 6650305 (E.D. Mich. Dec. 19, 2018).

Thus, authority supports the proposition that issues raised to the Appeals Council, even if not flagged for the ALJ, are exhausted. This rule makes sense. Allowing exhaustion in these circumstances fulfills the purposes of requiring exhaustion, which include giving the agency a chance to fix mistakes before the case comes to court. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952). Such error correction is already the

---

ALJ. Again, the court did not detail the legal basis for its holding; moreover, the plaintiff had argued to the ALJ that he met a different Listing than the one he advanced in court, making his failure to raise the latter Listing to the ALJ appear purposeful.

primary role of the Appeals Council, *see* 20 C.F.R. § 404.970(a); Jonah Gelbach & David Marcus, *A Study of Social Security Litigation in the Federal Courts*, 29 (2016) ("At present Appeals Council adjudication mostly involves error correction."); *see also Harper v. Sec'y of Health & Human Servs*, 978 F.2d 260, 264 (6th Cir. 1992) ("The Appeals Council is empowered to consider all aspects of a decision, even if the claimant seeks review of a portion only."), so this rule will not foist a crushing workload onto the Council.

Nor would it make much sense to force claimants to remind the ALJ of all the potential listings their impairments might meet or equal. For one thing, claimants do not have to file pre-hearing briefs limning the issues at stake. And the opportunities to do so are insubstantial. *Cf.* 2 Soc. Sec. Disab. Claims Prac. & Proc. § 19:51 (2nd ed.) ("Precisely because Social Security proceedings are not adversarial, there is not the pre-trial opportunities to identify, hone and isolate the issues in a particularized way."). True, the claimants' request for a hearing "should include . . . [t]he reasons [they] disagree with the previous determination or decision," 20 C.F.R. § 404.933(a)(2), but it is the Commissioner's duty to inform the claimant in a pre-hearing notice of "[t]he specific issues to be decided in your case." 20 C.F.R. § 404.938(b)(1); *see also Bradshaw v. Berryhill*, __F. Supp. 3d__, 2019 WL 1510953, at *6 (E.D. N.C. Mar. 26, 2019) (citing the regulation to "show the minimal role that claimants have in setting the issues for an ALJ's review").

While claimants can object to the issue statement, 20 C.F.R. § 404.939, and the regulations further state that the issues include all adverse determinations from the initial decision, 20 C.F.R. § 946(a)—which here considered her pituitary gland issues but did not address Listing 11.05, (R. 6, PageID.140-141)—the notice Plaintiff received in this case

promised her that the ALJ would trudge through all five steps of the disability analysis, (R. 7, PageID.197). Indeed, "The ALJ is responsible for identifying the appropriate Listing for the claimant's impairment." Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law & Procedure in Federal Court* § 3:22 (2019).

Plaintiff therefore had little cause to fear that the ALJ would skip a relevant Listing. *Cf.* 2 Soc. Sec. Disab. Claims Prac. & Proc. § 19:51 (2d ed.) ("Many issues that become central in an ALJ adjudication[] could not have been anticipated prior to the issuance of an ALJ's decision."). As one court aptly noted, "It makes little sense to require a plaintiff to raise the issue of whether his MS met the Listing for MS before the ALJ when it can be assumed that the ALJ would, as a matter of course because he is obligated to do so, consider this specific Listing." *Kennedy*, 2017 WL 4324829, at *7.[10] And it hardly seems optimal to force claimants to lard pre-hearing filings or prolong hearings with itemized lists of every issue simply to avert the risk of waiving those arguments, when the Appeals Council sits for the purpose of reviewing errors. *Cf.* Jon C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*, 97 Colum. L. Rev. 1289, 1318 (1997) (noting that due to the massive numbers of cases, ALJs are equipped with "significant responsibilities for issue identification,"

---

[10] One court has elaborated on this logic, holding that when

> an ALJ's decision violates a specific requirement clearly mandated by Social Security regulations . . . and no specific issue exhaustion requirement is provided by statute, regulation, and/or agency/court ruling, a plaintiff's challenge to the ALJ's error is not forfeited in federal court simply because the claimant's attorney failed to raise the specific issue during the administrative proceedings.

*Adams v. Berryhill*, No. No. CV 17-8724, 2019 WL 688202, at *5 (C.D. Cal. Feb. 19, 2019).

which contrasts with adversarial litigation; to modify the ALJ hearing model to "provide claimants with both the expectation and the meaningful opportunity to identify issues . . . . would reduce the efficiency and economic of [the agency's] 'mass justice' adjudicative system and threaten further delays and breakdowns in a bureaucracy already bursting at the seams"); Gelbach & Marcus, *supra* at 18 (noting the fantastically high number of cases each ALJ must dispose of each year).

The Commissioner's approach to waiver in this case would also lead to the strange result that ALJs' sins of commission are less susceptible to waiver than their sins of omission; that is, minor mistakes in ALJs' analysis of an issue are not waived but the ALJs' mistake of altogether forgetting to address an issue is. The Commissioner's brief here reflects this topsy-turvy framework by pushing for waiver only on the Listing argument, but not Plaintiff's second or third arguments. But Plaintiff did not raise those other issues to the ALJ any more than she did the Listing issue. The only relevant difference among Plaintiff's arguments is that the latter two, discussed below, attack issues the ALJ discussed in the decision, whereas the Listing argument does not. So issues that the ALJ happens to mention are not waived even if the claimant never raised them, but issues the ALJ wholly neglects are. More egregious blunders are thereby immunized from review.

For these reasons, I suggest that Plaintiff exhausted her listing argument by raising it with the Appeals Council.

### b. Merits of the Listing 11.05 Argument

The above conclusion merely gets Plaintiff in the door. She must still show that the ALJ should have examined Listing 11.05. Plaintiff, of course, shoulders the evidentiary

burden at step three and thus must have presented evidence fitting the Listing. *See McPhee v. Comm'r of Soc. Sec.*, No. 16-cv-13969, 2017 WL 4270029, at *8 (E.D. Mich. Sept. 26, 2017). As *Reynolds* establishes, an ALJ errs by overlooking Listings that need to be considered. 424 F. App'x at 416. But not every Listing applies in every case, and the ALJ can forego discussing those that the claimant "clearly does not meet." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* And the discussion should name the Listing and "offer more than a perfunctory analysis of the [L]isting." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). So the issue here is, was there a "substantial question" regarding whether Plaintiff met or equaled Listing 11.05? If so, the ALJ's failure to discuss it imperils his decision.

Listing 11.05 covers "[b]enign brain tumors, characterized by A or B," and Plaintiff focuses only on the "A" criteria:

> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities . . . .

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 11.05 (April 2017).[11] This Listing is stuffed with terms and phrases defined elsewhere. The first, "[b]enign brain tumors," refers to "noncancerous (nonmalignant) abnormal growths of tissue in or on the brain that invade

---

[11] Listing 11.05(B) provides an alternative means of meeting the Listing, but Plaintiff does not address it and so neither will I.

healthy brain tissue or apply pressure on the brain or cranial nerves." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.00(J) (April 2017). Plaintiff had such a tumor on her pituitary gland, but it was removed in 2010 and has not redeveloped.[12] (R. 7, PageID.325-328.)

Neither party broaches what should be the threshold question of whether a long-since removed tumor suffices under the Listing. The caselaw is similarly silent, save one case upholding the ALJ's Listing 11.05 analysis of a removed tumor, although the case did not specifically address whether the Listing should have been applied. *Spaulding v. Astrue*, No. 2:09–cv–00962, 2010 WL 3731859, at *16 (S.D. W.V. Sept. 14, 2010). In the present case, evidence suggests that the tumor's effects lasted into the present period for which Plaintiff seeks disability. Her pituitary tumor appeared to have triggered Cushing's syndrome, which is marked by abnormally high cortisol levels. (R. 7, PageID.342, 357, 359.) In 2016, her cortisol levels spiked again, leading her doctor to believe that her Cushing's syndrome had lingered. (R. 7, PageID.725, 726.) Thus, given *Spaulding*, the residual high cortisol levels, and Defendant's failure to argue that Listing 11.05 is inapplicable, I conclude that the Listing applies to the removed tumor.

The next phrase to unravel is "[d]isorganization of motor function," which "means interference, due to your neurological disorder, with movement of two extremities." 20

---

[12] The pituitary gland is located in the brain. Johns Hopkins Medicine, *Pituitary Tumor*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/pituitary-tumors (last accessed April 25, 2019). According to the American Brain Tumor Association, pituitary tumors constitute 9 to 12 percent "of all primary brain tumors." Am. Brain. Tumor Assoc., *Pituitary Tumors* https://www.abta.org/tumor_types/pituitary-tumors/ (last accessed April 25, 2019).

C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.00(D)(1) (April 2017). In particular, the affected movements must be standing up from a seated position, balancing while standing or walking, or using the upper extremities. *Id.* The limitation on these movements must be "extreme," meaning (somewhat redundantly) that it renders the claimant unable "[1] to stand up from a seated position, [2] maintain balance in a standing position and while walking, or [3] use your upper extremities to independently initiate, sustain, and complete work-related activities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.00(D)(2) (April 2017).

These three phrases have their own elaborations, but Plaintiff touches upon only the first two (*i.e.*, standing up and maintaining balance). The inability to stand up occurs when the claimant is "unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.00(D)(2)(a) (April 2017). The "[i]nability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.00(D)(2)(b) (April 2017).

The record contains evidence that issues with Plaintiff's extremities resulted in her difficulty walking and maintaining balance, bolstered by some positive diagnostic testing. (R. 7, PageID.556-557, 609-621, 662, 677, 730, 866, 868, 873.) And these conditions, labeled ataxia, led Dr. Murshed in 2016 to prescribe a wheeled walker, the sort of assistive device mentioned in the Listing. (R. 7, PageID.861, 863, 868, 870, 873, 875.)

Countervailing evidence exists, such as examination results showing normal gait or lack of motor weakness, (R. 7, PageID.556-557, 591, 593, 596, 679, 682, 685, 688, 691, 839, 861, 863, 868, 870, 873, 1032, 1037), but the question here is not the balance of evidence or even if substantial evidence supports the ALJ's analysis; rather, it is whether the record contains enough to raise a substantial question about Plaintiff's meeting or equaling Listing 11.05. The evidence here provides a basis for questioning whether Plaintiff has the extreme limitations laid out in Listing 11.05. Defendant, in fact, admits that the ataxia and related symptoms require the use of the wheeled walker and that this might be tantamount to "[d]isorganization of motor function in two extremities . . . resulting in an extreme limitation . . . in the ability to stand up from a seated position [or] balance while standing or walking." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 11.05(A) (April 2017); (R. 15, PageID.1119-1120.)

But, as Defendant points out, the extreme limitations must result from the tumor. (R. 15, PageID.1120-1121.) On this point, Defendant finds no evidence to support Plaintiff's position, noting that her doctors thought the dizziness was related to migraine headaches or hypoglycemia and Dr. Murshed never linked the dizziness to the tumor removal. (*Id.*, citing R. 7, PageID.568-569, 573, 609-621, 860-890.) Defendant's reading of the records is questionable.

Dr. Compean's "indication" that the dizziness related to migraines is by no means clear. His paragraph of notes on dizziness (a jumble of fragmentary findings repeated in multiple reports), do not say that it sprang from headaches. Rather, the paragraph cryptically observes, "Pertinent medical conditions include migraine headache"—hardly

35

evidence that one condition caused the other. *See, e.g.*, (R. 7, PageID.569, 763.) Further eroding Defendant's reading is that under Dr. Compean's notes on Plaintiff's headaches, dizziness is not listed. (*Id.*)

Perhaps most important, Dr. Compean believed that the dizziness related to the hypoglycemia, which in turn he thought was caused by pituitary issues or Plaintiff's gastric bypass. (R. 7, PageID.50, 568, 573.) The ALJ laid out this potential causal chain—pituitary issues causing hypoglycemia causing dizziness—without going a further step back, to Plaintiff's pituitary gland tumor that potentially caused the hypoglycemia. This establishes a connection, albeit somewhat obscure and uncertain, between the tumor and the dizziness. And one of the general symptoms of pituitary tumors is dizziness. *See* U.S. Dep't of Health & Human Servs., Nat'l Institutes of Health, *What are the symptoms of pituitary tumors?* (Dec. 1, 2016), https://www.nichd.nih.gov/health/topics/pituitarytumors/condition info/symptoms.[13] Also, when Dr. Compean treated Plaintiff after the tumor-removal surgery, he recorded his "doubts about complete remission in her case because she is [*sic*] always had so many other nonspecific symptoms." (R. 7, PageID.358.)

Dr. Murshed's notes do not draw any connections between migraines and dizziness or ataxia. The reports for many sessions contain a paragraph on each condition, and neither mentions the other as a correlated symptom. (R. 7, PageID.610, 613, 616, 617, 860-861,

---

[13] Dr. Khoury thought the dizziness was unrelated to the endocrine system (which is related to the pituitary gland), but did not develop this conclusion or reject the possibility that the tumor could have caused the dizziness. (R. 7, PageID.725, 728.)

863-864, 868-871, 873-876, 878-879, 881-885, 887.)[14] If anything, Dr. Murshed coupled the dizziness with the Cushing's syndrome, writing under the section for ataxia treatment that Plaintiff should follow up with an endocrinologist about Cushing's. (R. 7, PageID.868.) His notes, too, repeatedly express uncertainty about the cause of the dizziness. *See, e.g.*, (R. 7, PageID.868, 883.)[15] Finally, for her part, Plaintiff reported that the dizziness had occurred without migraines. (R. 7, PageID.922.)

Even if Defendant was correct, and the evidence indicated that the dizziness related to headaches, that conclusion would not preclude the tumor (and the conditions it caused) from functioning as a confounding variable; that is, the tumor could explain both the headaches and the dizziness, or the tumor could have caused the headaches which in turn caused the dizziness. Both her headaches and dizziness appear to have developed post-surgery, and Dr. Compean treated them at that time under the diagnosis of "Cushing disease status post pituitary surgery." (R. 7, PageID.349, 357-358.) Pituitary tumors can lead to both headaches and dizziness. *See* Nat'l Institutes of Health, *What are the symptoms of pituitary tumors?*, *supra*.; *see also* Mayo Clinic, *Pituitary tumors* (Mar. 16, 2019), https://www.mayoclinic.org/diseases-conditions/pituitary-tumors/symptoms-causes/syc-

---

[14] Under the "ataxia" section of a few session reports, Dr. Murshed wrote, "repeat MRI brain in November/December gieven [*sic*] 2 non specific hyperintense white matter lesions (might be related to headaches)." (R. 7, PageID.613, 616, 617, 883, 885, 887.) It appears that he was discussing the MRIs in relation to ataxia, but that one MRI revealed symptoms that could be related to headaches. In other words, the parenthetical note about headaches was happenstance and unrelated to the ataxia. The "ataxia" section of another report contained the line, "Follow up with headache clinic for trial of botox." (R. 7, PageID.616, 885.) If this represented an attempt to link the headaches and dizziness, it is woefully undercooked.

[15] Another report on Plaintiff's dizziness, from June 2014, states that "there appears to be a migrainous element in her presentation," but a "second opinion" was necessary; no connection was made between the migraines and dizziness. (R. 7, PageID.557.)

20350548 (noting headaches are a symptom). This could, of course, be nothing more than a non-causal correlation—but the connection between the tumor, Cushing's syndrome, the headaches, and the dizziness is at least as solid as anything Defendant points to.

In addition, there was evidence that other effects of Cushing's (which was associated with the tumor) continued into 2016. That year, her cortisol levels had flared, which her physician thought could signal a reoccurrence of Cushing's. (R. 7, PageID.725, 736.) Although the levels were later brought under control, the episode suggests the tumor had prolonged impacts on Plaintiff's health.

All of this is enough to raise a substantial question about whether Plaintiff could meet or equal Listing 11.05. At the most basic level, Plaintiff had a benign tumor that appears related to some of her more significant conditions, such as Cushing's syndrome; the Listing for benign tumors requires evidence of conditions Plaintiff had; thus the Listing provides a potential fit for Plaintiff's impairments. The prior ALJ must have thought so, as he considered the various impairments (without specifying each individually) in section 11.00 of the Listings, which includes Listing 11.05. (R. 7, PageId.115.)

It is true that the evidence provides no unassailable links between the tumor and the dizziness—the record leaves even the connection between the tumor and Cushing's syndrome somewhat murky. And Plaintiff's brief offers little to fill in the gaps. But the record is long and complex and needed elucidation from the ALJ. His failure to provide it is one of the impediments to effective judicial review of his decision. *Reynolds*, 424 F. App'x at 416 ("In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate

meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.").

More than merely silent, the ALJ appeared unfamiliar with the nature of Plaintiff's pituitary problems and the treatment she received for them. In the decision's step-three section, without disclosing the underlying condition leading to the procedure, the ALJ suggested that the surgery plucked out Plaintiff's entire pituitary gland. (R. 7, PageID.45 ("The claimant's history of removal of the pituitary gland does not result in ongoing impairment impacting another body system.").) That is not what happened. Plaintiff had a "[t]ransnasal excision of [a] pituitary tumor," (R. 7, PageID. 325), not a hypophysectomy, which removes the whole gland, see Michael Buchfelder & Sven Schlaffer, *Pituitary Surgery for Cushing's Disease*, Neuroendocrinology 104 (2010). Apparently thinking the gland was gone, the ALJ concludes without more that "[t]herefore, Listing 9.00 [dealing with endocrine disorders, such as hypoglycemia,] is not met." (R. 7, PageID.45.) Listing 9.00 evaluates endocrine disorders by evaluating the impairments they cause "under the listings for other body systems." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 9.00 (April 2017). As an example of this approach, Listing 9.00 mentions that the Commissioner would evaluate hypoglycemia using Listing 11.00. *Id.* at § 9.00(b). The ALJ did not do so. At this point in the analysis, it is thus unclear whether the ALJ knew Plaintiff had a pituitary tumor that was removed.

The remainder of the decision can be rummaged through to see if the ALJ captured the gist of the step-three analysis at some other place. *See Gower v. Comm'r of Soc. Sec.*, No. 13–14511, 2015 WL 163830, at *28 (E.D. Mich. Jan. 13, 2015). He did not. The ALJ

noted that Plaintiff "underwent surgery for her pituitary gland" and after the "initial pituitary issue" she had reoccurring symptoms of Cushing's. (R. 7, PageID.48.) Shortly after these bland descriptions, the ALJ laid out a possible nexus between the tumor and the dizziness: "The claimant's falls due to dizziness were noted [in Dr. Compean's notes], along with hypoglycemia, which was thought to be due to either pituitary issues or history of gastric bypass surgery." (R. 7, PageID.49.) The ALJ did not pursue this line. Instead, he thought the dizziness was associated with Plaintiff's headaches, a conclusion that lacks any appreciable evidentiary, support as noted above. (R. 7, PageID.50.)

Defendant's final attempt to salvage the ALJ's step-three analysis relies on SSR 17-2p's new pared-down articulation requirements that demand from ALJs hardly a peep on medical equivalence to Listings at step three:

> If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

2017 WL 3928306, at *4 (Mar. 27, 2017); *see* (R. 15, PageID.1116-1117.) The Ruling covers only half of the step-three analysis, (*i.e.* equivalence), and Defendant's reliance on it is therefore only half-relevant: Plaintiff contends not merely that her tumor equaled the severity of Listing 11.05, but that it actually met the Listing's requirements irrespective of

equivalence. The problem, then, is not that the ALJ skimped on explaining his conclusion about medical equivalence. Perhaps SSR 17-2p would allow for that. Rather, the fault in the decision is that the ALJ failed to consider Listing 11.05 at all. The Ruling does not speak to this.[16]

In short, Plaintiff had a benign tumor. There's a Listing for that. The ALJ ignored it, even though Plaintiff's symptoms matched those in the Listing. This merits remand. It is possible that, on remand, the ALJ will reject Plaintiff's argument, perhaps because the current evidence lacks clear links between the tumor and the dizziness. Indeed, the issue is close. Ultimately, however, the better course is to ensure that the ALJ considered all the evidence under the proper Listings. For these reasons, I recommend remanding the case.

### 2. Plaintiff's Other Arguments

Because the case should be remanded on Plaintiff's first argument, it is unnecessary to reach her final two contentions and the Commissioner is free to consider these questions on remand. To be complete, however, I will address both.

Plaintiff argues that the ALJ included an assistive device in the RFC but impermissibly failed to specify the type of device. (R. 12, PageID.1090.) This oversight "matters," she says, because her need for a walker is considered an "extreme limitation" under Listing 11.00 (D)(2)(a). (R. 12, PageID.1091.)

It is unclear whether Plaintiff intends this observation to be an extension of her

---

[16] Defendant disregards the Ruling's limited scope, sweepingly declaring that "[p]ut simply, under SSR 17-2p, the ALJ was not required to articulate specific evidence underpinning his step-three finding." (R. 7, PageID.1117.)

Listing argument or an independent ground for reversal. If the latter, she fails to elaborate on why the Listing's characterization is relevant and she presents no legal support for the notion that the ALJ must generally distinguish the types of assistive devices a claimant requires. Under the pertinent Social Security Ruling, 96-9p, 1996 WL 374185, at *7, medical documentation must establish the "need for a hand-held assistive device to aid in walking or standing," and the ALJ should consider "the circumstances for which it is needed." *See also Jagdeo v. Berryhill*, No. 3:17-CV-469-TWP-DCP, 2019 WL 1119363, at *15 (E.D. Tenn. Feb. 19, 2019) ("The Sixth Circuit has explained that unless a cane or other assistive device is found to be a necessary device, it will not be considered an exertional limitation that reduces a claimant's ability to work." (citation omitted)), *Rep. & Rec. adopted by* 2019 WL 1119642 (E.D. Tenn. Mar. 11, 2019). Nothing in the Ruling mandates that ALJs select among the types of devices, although the Ruling indicates that devices requiring the use of only one hand would allow the claimant "to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." SSR 96-9p, 1996 WL 374185, at *7. Common sense might suggest a difference between two-handed and one-handed devices, but Plaintiff does not develop this line of reasoning.

Her real argument about the assistive devices appears to be that "the need for a walker, at minimum, indicates a significant erosion of the sedentary occupational based" as discussed in SSR 96-9p. (R. 7, PageID.1091-1092.) Social Security Ruling 96-9p warns adjudicators that the occupational base (*i.e.*, the number of available jobs) for unskilled sedentary work might be "significantly eroded" if the claimant needs an assistive device.

42

1996 WL 374185, at *7. The way to resolve the issue, the Ruling continues, is to consult a vocational resource. *Id.* That is what the ALJ did here, asking the vocational expert for the number of jobs Plaintiff could perform if she needed an assistive device. (R. 7, PageID.102.)

The problem, however, is that the vocational expert was not asked to and did not distinguish among the classes of assistive devices. Defendant surmises that everyone at the hearing knew the only assistive device at issue was a walker, even if they failed to say it. (R. 15, PageID.1124-1125.) However sensical this assumption might seem, the hypothetical question itself must accurately portray the claimant's condition. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). If the term "assistive device" is not descriptive enough, then using it in the hypothetical will not accurately convey the claimant's limitations.

Here, the term was not specific enough. The vocational expert might have believed that, even though the only device Plaintiff used was a walker, the ALJ's reference to a broader class of devices (*i.e.*, all assistive devices) indicated that the ALJ thought Plaintiff could make do with a cane or other non-walker device. Had the ALJ meant to include these additional types of devices in the RFC, his analysis should have been clearer.[17] As Defendant observes, "in his decision, the ALJ discussed no other assistive device, save Plaintiff's use of a wheeled walker." (R. 15, PageID.1123.)

The scant caselaw addressing the issue supports Plaintiff. In *Anderson v. Colvin*,

---

[17] The ALJ very well could have concluded that Plaintiff could ambulate with less-supportive devices, as he observed that she "has consistently been noted as walking without difficulty." (R. 7, PageID.50.)

No. 15-00217-B, 2016 WL 5723675, at *4 (S.D. Ala. Sept. 30, 2016), the hypothetical question to the vocational expert and the RFC both limited the claimant to "using an unspecified 'handheld assistive device.'" Similarly to the present case, the record in *Anderson* contained evidence of only one type of device, "two crutches." *Id.* Rejecting the ALJ's hypothetical as incomplete, the court explained that

> the ALJ did not make clear that the referenced "handheld assistive device" consisted of two crutches which were required for ambulation. . . . In other words, there is a huge difference between relying on two crutches to ambulate versus utilizing a cane or other device. This is particularly true where the record establishes that Plaintiff cannot lift while using the two crutches to ambulate. As argued by Plaintiff, the ALJ's incomplete hypothetical affected the reliability of the VE's testimony regarding Plaintiff's ability to perform jobs which require occasional lifting/carrying, stooping, crouching, kneeling, and crawling.

*Id.* at *5.

*Anderson* endorsed the significance of differences among assistive devices and the consequent need for precision in the ALJ's analysis. Similarly, *Anderson* described a real tension produced by the ALJ's lack of specificity, one that is present in the instant case: if a claimant needs two hands on her assistive device, how is she able to occasionally lift or carry objects, stoop, crouch, kneel, and crawl?[18] *See also Prettyman-Silva v. Astrue*, No. 09–518–HA, 2010 WL 2595573, at *3 (D. Ore. June 17, 2010) ("The use of a walker

---

[18] Both Plaintiff and the claimant in *Anderson* were limited to sedentary work, which means they must be able to lift 10 pounds and occasionally lift objects like small tools. 20 C.F.R. § 404.1567(a). The *Anderson* plaintiff, however, could not only lift up to 10 pounds but also *occasionally* lift or carry that weight, a requirement that is not present in Plaintiff's RFC. 2016 WL 5723675, at *4. The difference is at most a matter of a few pounds.

precludes jobs where plaintiff must use her hands while standing because her hands are occupied with the walker.").

These problems undercut the ALJ's step-five conclusion, the step at which the Commissioner assumes the burden of proof. *See Combs*, 459 F.3d at 643. Consequently, I suggest that the Commissioner failed to meet her burden by not specifying the type of assistive device Plaintiff required. The ALJ should do so on remand, and also clarify how the device affects her other abilities and whether the number of available positions is thereby reduced.

Plaintiff's final argument is that the ALJ botched the credibility assessment of Plaintiff's complaints of fatigue. (R. 12, PageID.1092-1094.) She acknowledges that the ALJ "appears to accept Ms. Sharp's experience of fatigue." (R. 12, PageID.1093.) But Plaintiff takes aim at the ALJ's statement that her "complaints have not been completely dismissed, but rather, have been included in the residual functional capacity assessment, to the extent they are consistent with the evidence as a whole." (*Id.* (quoting R. 7, PageID.53).) The Commissioner has rejected boilerplate like this, telling ALJs that it is insufficient without additional "specific reasons" for the credibility assessment. SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016).

Here, I conclude that the ALJ provided enough reasons to satisfy the Ruling and regulations. As Plaintiff herself admits, the ALJ noted her complaints of fatigue. *See* (R. 7, PageID.48-49, 51.) While the decision would have benefited from a more detailed analysis, three aspects of the ALJ's discussion ultimately lead me to reject Plaintiff's argument. First, he cited the repeated statement in Dr. Compean's notes that the fatigue only

moderately limited activity. (R. 7, PageID.49, 568, 773, 784, 810, 821.) This signals that the ALJ considered the extent to which the fatigue limited Plaintiff's abilities.

Second, the ALJ specifically described his attempt to account for fatigue by limiting her to sedentary work with additional exertional restrictions. (R. 7, PageID.53.) Plaintiff does not suggest how else the fatigue would circumscribe her RFC. And she cites only one additional piece of evidence, her testimony that she takes two 30-minute naps a day, which she says the ALJ ignored. (R. 12, PageID.1094.) For one thing, the ALJ is not required to—and almost certainly could not—discuss every speck of evidence the record contains. *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011). It was enough for the ALJ to address, as a whole, Plaintiff's testimony about fatigue without further inspecting each of her statements. And, in any event, Plaintiff fails to explain how two 30-minute naps a day—which presumably could be taken before or after work—would throw her off task at work.

Third, the ALJ noted and considered the physical and mental conditions that potentially caused Plaintiff's fatigue. (R. 7, PageID.53.) The analysis of these conditions thus related to the ALJ's conclusion regarding fatigue. But Plaintiff does not attack the ALJ's analysis of those conditions as it bears upon her credibility regarding fatigue.

Accordingly, I see no merit in Plaintiff's argument that the ALJ's credibility analysis erred.

## II. CONCLUSION

For the reasons above, I recommend **GRANTING** Plaintiff's Motion for Summary Judgment, (Doc. 12), **DENYING** the Commissioner's Motion, (Doc. 15), **VACATING**

the Commissioner's final decision denying benefits, and **REMANDING** the case to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## IV.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 2, 2019

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  May 2, 2019

By:   s/Sara Krause, acting in the absence of Kristen Castaneda, Case Manager